IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN MICHAEL H.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| FRANK BISIGNANO, Commissioner of Social Security | : | |
| | : | NO. 25-3586 |

**MEMORANDUM AND ORDER**

CAROLINE GOLDNER CINQUANTO, U.S.M.J. September 29, 2026

Plaintiff seeks review of the Commissioner's decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI").[2] For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is supported by substantial evidence and affirm the Commissioner's decision.

---

[1]Consistent with the practice of this court to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using his first name and last initial. See Standing Order – In re: Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]In order to be eligible for DIB, Plaintiff must establish that he became disabled prior to the expiration of his insured status or date last insured ("DLI"). 20 C.F.R. § 404.131(b). SSI does not have any such requirement. Here, Plaintiff's DLI was December 31, 2018. Tr. at 12, 220, 227.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed applications for DIB and SSI on February 16, 2018, alleging disability beginning on June 30, 2013. Tr. at 97, 184-88, 191-94.[3] He claims to be disabled based on anxiety disorder, panic disorder, bipolar disorder, major depressive disorder ("MDD"), dissociative disorder, and obsessive-compulsive disorder ("OCD"). Id. at 230. His applications were denied initially on June 6, 2018, id. at 101-05 (SSI), 106-09 (DIB), and he requested an administrative hearing. Id. at 112-15.[4] After holding a hearing on August 15, 2019, id. at 39-74, the ALJ issued an unfavorable decision on October 2, 2019. Id. at 10-19. The Appeals Council denied Plaintiff's request for review on September 9, 2020, id. at 1-3, making the ALJ's October 2, 2019 decision the final decision of the Commissioner. 20 C.F.R. §§ 404.981; 416.1481.

[3] At the administrative hearing, Plaintiff amended his onset date to April 10, 2017. Tr. at 51.

[4] This matter appears to have been a disability redesign prototype case. The Commissioner selected cases to test eliminating the reconsideration of review. See 20 C.F.R. §§ 404.906(a); 416.1406(a); see also Edwards v. Astrue, Civ. No. 10-1088, 2011 WL 1430324, at *1 n.6 (E.D. Pa. Apr. 6, 2011) (explaining redesign prototype cases).

Plaintiff sought review in federal court on July 14, 2025, Doc. 1,[5] and the matter is now fully briefed. Docs. 10-12.[6]

## II. LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999). Therefore, the issue in this case is whether there is substantial evidence to support the Commissioner's conclusion that Plaintiff is not disabled. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)); see also Biestek v. Berryhill, 587 U.S. 97, 103 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

---

[5]On October 3, 2020, Plaintiff requested additional time to file an appeal in the federal court, tr. at 34, which the Appeals Council granted on September 13, 2024. Id. at 31. At that time, however, the case materials were inaccessible. See id. at 29 (letter from counsel to Appeals Council). The file was ultimately made available to Plaintiff's counsel on June 13, 2025, id. at 27, and Plaintiff filed his federal complaint on July 14, 2025. Doc. 1.

[6]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). See Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 6.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process, evaluating:

> 1. Whether the claimant is currently engaged in substantial gainful activity;
>
> 2. If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities that has lasted or is expected to last for a continuous period of 12 months;
>
> 3. If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4. If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and
>
> 5. If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. § 404.1520(a)(4). Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local

and national economies, in light of his age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007).[7]

## III. DISCUSSION

### A. ALJ's Findings and Plaintiff's Claims

In her October 2, 2019 decision, the ALJ found at step one that Plaintiff has not engaged in substantial gainful activity since April 10, 2017, his amended alleged onset date. Tr. at 12. At step two, the ALJ found that Plaintiff has the following severe impairments: bipolar I disorder, generalized anxiety disorder ("GAD"), uncomplicated alcohol and anxiolytic abuse, and disorder of the spine. Id. At the third step, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments." Id. at 13. The ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform medium work except he can perform no climbing of ladders, ropes, or scaffolds; no work at unprotected heights; and is limited to simple routine tasks, simple work-related decisions, no contact with the public, and occasional contact with supervisors and co-workers. Id. at 14. At the fourth step, the ALJ found Plaintiff is unable to perform any of his past relevant work. Id. at 18. Based on the Plaintiff's age, education, experience, and RFC, a vocational expert ("VE") testified that Plaintiff could perform the jobs of laundry laborer,

[7] Alcoholism and/or drug addiction becomes relevant only after a finding of disability, at which time "[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).

kitchen helper, and hand packer. Id. at 70. Based on this testimony, the ALJ found that Plaintiff is not disabled. Id. at 19.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to properly consider the opinion of Plaintiff's treating psychiatrist and failed to include all the credibly established limitations in her RFC assessment and hypothetical posed to the VE. Doc. 10. Defendant responds that the ALJ's determination is supported by substantial evidence and that the ALJ properly considered the opinion evidence. Doc. 11. Plaintiff has filed a Reply. Doc. 12.

**B. Plaintiff's Claimed Limitations and Testimony at the Hearing**

Plaintiff was born on June 24, 1979. Tr. at 184, 191. He completed eleventh grade. Id. at 44-45. Plaintiff has past relevant work as a janitor working for a church. Id. at 68. Plaintiff was 40 years old at the time of the administrative hearing and at the time of the ALJ's decision on October 2, 2019. Id. at 43.

At the administrative hearing, Plaintiff testified as follows. He stopped working in 2013 because he started having panic attacks. Tr. at 45-56. He has been treated for anxiety, depression, and dissociation for many years, but the medications "don't seem to work very well." Id. at 47. He does "okay for a little while, and then after that . . . I'm back to where I was, to square one." Id. He constantly has worries about "the weather, snow, dying, having a heart attack, stroke, cancer, something happening to [his family], [and a] car accident." Id. at 54. As an example, Plaintiff explained that he had a panic attack on January 25, 2018, when he "felt something in [his] chest rolling around." Id. at 55. Although x-rays were negative, he is convinced he has cancer and the doctors missed

it. Id. Plaintiff suffers from a dissociative state three times a week for 15 minutes to an hour each time, during which "things don't seem real. It's like you're in another dimension of space and time. You don't know where you are. You get confused." Id. at 57. He has also had visual and auditory hallucinations, id. at 57-58, and suffers from panic attacks twice a week for an hour to two hours when his heart races, muscles get stiff, and he vomits and has diarrhea. Id. at 63-64.

Plaintiff needs reminders to bathe and bathes only once a month, changes his clothes every other day, and does not brush his teeth everyday. Tr. at 62. He cannot deal with stress, changes in his routine, or criticism. Id. at 64-65. He has mood swings during which he flies off the handle, getting aggressive and angry. Id. at 66.

A VE also testified at the administrative hearing. Tr. at 69-72. The VE characterized Plaintiff's prior position as a janitor as medium, semi-skilled work. Id. at 69. Based on the hypothetical posed by the ALJ with the limitations included in the ALJ's RFC assessment, see supra at 5, the VE testified that such an individual could not perform Plaintiff's past relevant work. Tr. at 69.[8] However, the VE testified that such an individual could perform work as a laundry laborer, kitchen helper, or hand packer. Id. at 69-70. The ALJ specifically asked the VE to consider if the person could never have contact with the public, and only occasional contact with supervisors and coworkers. The

[8]When questioning the VE about Plaintiff's abilities to perform his past work, the ALJ asked a modified hypothetical in which the person could frequently have contact with the public, supervisors, and coworkers. Tr. at 69. The VE explained that such a person could not perform Plaintiff's past job as a janitor. Id.

VE responded that the person could perform the jobs indicated; however, if the person would be off-task 20% of the normal workday, the VE testified that the person could not perform the jobs identified. Id. at 70. When questioned by Plaintiff's counsel, the VE testified that a person with marked problems interacting with supervisors would preclude all work and if the person would be absent one day per week, the VE testified that all work would be precluded. Id. at 71.

### C. **Medical Evidence Summary**[9]

#### 1. Treatment Providers

Plaintiff has a history of bipolar affective disorder II dating back to at least 2008, when he was treated by Muhammad Nadeem Shamsi, M.D. Tr. at 446.[10] Historically, Dr. Shamsi prescribed Plaintiff Klonopin, Vistaril, Neurontin, lithium carbonate, and Zyprexa.[11] See e.g., id. at 341. Even when Dr. Shamsi noted that Plaintiff was "doing

---

[9]Plaintiff's claims focus on his mental impairments. Therefore, I will review the treatment notes related to his mental health impairments at length and mention his treatment for back spasms and pain only when relevant to his mental health treatment.

[10]Plaintiff was admitted to the Pottstown Hospital psychiatric unit when he was 18 or 19 years old for cutting his wrist with a razor. See tr. at 333 (psychiatric history).

[11]Klonopin (generic clonazepam) is a benzodiazepine used to treat seizure disorders and panic disorder. See https://www.drugs.com/klonopin.html. Vistaril (generic hydroxyzine) is an antihistamine that is used as a sedative to treat anxiety and tension. See https://www.drugs.com/vistaril.html. Neurontin is an anticonvulsant that is also used to treat neuropathic pain and to treat seizures. See https://www.drugs.com/neurontin.html. Lithium carbonate is a mood stabilizer used for the acute treatment of manic and mixed episodes associated with bipolar 1 disorder and for maintenance treatment of bipolar 1 disorder. See https://www.drugs.com/lithium.html. Zyprexa (generic olanzapine) is an antipsychotic used to treat schizophrenia and bipolar 1 disorder. See https://www.drugs.com/zyprexa.html (last visited Aug. 24, 2026).

well," his Global Assessment of Functioning ("GAF") score was 55.[12] In 2015, Dr. Shamsi added naltrexone to Plaintiff's regimen when Plaintiff admitted drinking excessively.[13] Id. at 353. When Plaintiff complained of occasional tremors on September 13, 2016, id. at 370, Dr. Shamsi added benztropine.[14]

Just prior to Plaintiff's amended alleged onset date, he complained to Dr. Shamsi of episodes of dissociation for which the doctor reduced his dosage of Klonopin. Tr. at 375. On April 10, 2017, Plaintiff again complained of episodes of dissociation. Id. at 376. Dr. Shamsi added acamprosate to replace naltrexone, which Plaintiff stated had

---

[12]The GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health. Diagnostic and Statistical Manual of Mental Disorders, 4th ed. Text Revision (2000) ("DSM-IV-TR") at 32. A GAF score of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. at 34. The DSM-5, which replaced the DSM-IV-TR, eliminated reference to the GAF score. Thus, the GAF rating does not appear in Dr. Shamsi's more recent treatment notes.

[13]Naltrexone is used to treat alcohol use disorder to reduce cravings and help control physiological dependence. See https://www.drugs.com/naltrexone.html (last visited Aug. 24, 2026). At the same time, the doctor discontinued Neurontin. Id.

[14]Benztropine (brand name Cognentin) is used to treat Parkinson-like symptoms, including tremors, caused by using other medications. See https://www.drugs.com/mtm/benztropine.html (last visited Aug. 24, 2026).

become ineffective.[15] Id. On September 22, 2017, Dr. Shamsi added Valium to Plaintiff's treatment regimen.[16] Id. at 380.

In December 2017, Plaintiff complained of nervousness and paranoia and Dr. Shamsi noted that Plaintiff "has some surfacing of replaying songs in his head, avoidance and ideas of references." Tr. at 383.[17] On mental status exam ("MSE"), Dr. Shamsi noted that Plaintiff was anxious and his thought content included obsessions and paranoia. Id. at 384. Dr. Shamsi diagnosed Plaintiff with bipolar disorder, current episode manic, severe with psychotic features, and the doctor began titrating lithium. Id.

On January 22, 2018, Dr. Shamsi noted Plaintiff had severe anxiety and fear of the unknown. Tr. at 385. The doctor reintroduced Neurontin. Id. Two days later, Plaintiff called the doctor in crisis, complaining that he "was becoming more explosive and hostile

---

[15]Acamprosate is used to help people who are alcohol dependent to abstain from drinking alcohol. See https://www.drugs.com/acamprosate.html (last visited Aug. 24, 2026).

[16]Valium (generic diazepam) is a benzodiazepine used to treat anxiety disorder and alcohol withdrawal symptoms. See https://www.drugs.com/valium.html (last visited Aug. 24, 2026).

[17]Plaintiff's mother was diagnosed with breast cancer in late 2017 – early 2018. See tr. at 333 (noting mother's cancer diagnosis in September 2017), 383 (reference to mother's cancer in December 26, 2017 treatment note), 620 (Plaintiff reported to therapist that mother's cancer diagnosis was January 2018).

and severely anxious." Id. at 388. Against Dr. Shamsi's instructions, Plaintiff had stopped taking lithium when he started gabapentin (Neurontin). Id.

On January 25, 2018, Kevin Kramer, D.O., treated Plaintiff at the emergency department of Phoenixville Hospital for chest pain, determined to be a panic attack. Tr. at 314, 321. On January 29, 2018, Plaintiff advised Dr. Shamsi that "he ran out of Valium last month . . . .explaining his severe level of anxiety and agitation." Id. at 389. On MSE, Dr. Shamsi noted Plaintiff's anxious mood and affect, and his thought content included ideas of helplessness. Id. at 389-90. Dr. Shamsi "educated patient about [the] risks and benefits of the medication and [the] effect of abruptly stopping [it]." Id. at 390. Dr. Shamsi discontinued gabapentin. Id.

On February 19, 2018, Plaintiff began therapy at Creative Health Services, complaining that his anxiety had become more intense three weeks prior. Tr. at 333. On MSE, Donna Griffin, M.A., noted that Plaintiff showers once a month, was lethargic and depressed, had a flat affect, reported auditory and visual hallucinations, and had variable attention/concentration. Id. at 331-32. Ms. Griffin recommended individual therapy once a week and group therapy, which Plaintiff declined. Id. at 338. Plaintiff began weekly therapy with Tanja Gustafson, L.S.W. ("Therapist Gustafson"), on March 19, 2018, at which time she noted that Plaintiff appeared sad and "had trouble a few times completing a thought." Id. at 607. Plaintiff felt "trapped in his psychological challenges with depressed mood and panic attacks." Id. On March 28, 2018, Therapist Gustafson noted that Plaintiff focused on catastrophic outcomes. Id. at 609. On April 4, 2018, Plaintiff reported persistent anxiety and dissociative symptoms to Dr. Shamsi. Id. at 391.

Dr. Shamsi suggested Plaintiff see a psychiatrist in his neighborhood near his therapist; however, Plaintiff declined. Id. at 392.

On April 9, 2018, Plaintiff reported feeling depressed and "feeling numb and in a trance for several hours" after cleaning out boxes of papers and memorabilia. Tr. at 613. Plaintiff reported feeling better by the end of the session. Id. On April 23, 2018, Plaintiff discussed his concerns about his mother's illness and Therapist Gustafson noted that Plaintiff focuses on "what if" thoughts that increase his anxiety and depression. Id. at 614.

Plaintiff reported to Therapist Gustafson on May 16, 2018, that he was worried that he had a brain tumor because he had a twitching eyelid. Tr. at 615. On June 4, 2018, Plaintiff reported to Dr. Shamsi that he was having more episodes of dissociation, as well as cycling emotions between severe anxiety and depression. Id. at 538. Dr. Shamsi added Depakote to Plaintiff's regimen.[18] Id. at 539. The following day, Plaintiff expressed his frustration with the ineffectiveness of his medications and described the cycling feelings between anxiety and depression "as if a light switch was flipped." Id. at 620.

On June 12, 2018, despite reporting that he was denied social security, Plaintiff appeared calm and relaxed to Therapist Gustafson. Tr. at 622. On July 2, 2018, Dr. Shamsi reported that Plaintiff's mood had lifted and noted a reduction in anxiety. Id. at

[18]Depakote (generic divalproex) is used to treat manic episodes related to bipolar disorder. See https://www.drugs.com/depakote.html (last visited Aug. 24, 2026).

541. Dr. Shamsi noted that Plaintiff frequently calls his office for "trivial matters." Id. He recommended that Plaintiff seek help where he was receiving therapy and transferred his records to Creative Health.[19] Id. a 543.

On July 7, 2018, Plaintiff reported to Therapist Gustafson that he "felt less anxiety and depression since starting Depakote." Tr. at 625. When Plaintiff saw Tanya Kirby, M.D., at Creative Health on July 9, 2018, Plaintiff reported good days and bad days, but stated that he felt better 2-3 months prior. Id. at 627. Plaintiff reported that he watches television all day and that it was hard to get motivated with his depression. Id. Dr. Kirby diagnosed Plaintiff with bipolar disorder, current episode mixed, unspecified, an adverse effect of benzodiazepines, sedative, hypnotic or anxiolytic abuse, and alcohol abuse. Id. at 627-28. On MSE, Dr. Shamsi noted a constricted affect. Id. at 628. Dr. Kirby

---

[19]Dr. Shamsi included the following in his treatment note:

> He also has some tendency of tapering and discontinuing medication without having a discussion. He has previous episodes of abruptly discontinuing benzodiazepine and having severe panic attacks. He has been cautioned and educated about these matters since multiple calling does create disruption and affects provision of quality of care to other patients. I recommend that patient should seek help in the facility where he gets intensive case management and facility is closer to his neighborhood. He set up an appointment at [C]reative [H]ealth. His records [are] being transferred.

Tr. at 543.

prescribed olanzapine, hydroxyzine, lithium, escitalopram, and divalproex.[20] Id. at 636-37.

In the session notes for Plaintiff's August 9, 2018 therapy, Therapist Gustafson noted that Plaintiff had a drowsy and blunted affect and showed no emotional responses. Tr. at 641. Plaintiff reported taking increased amounts of Valium and was concerned that he was not able to manage his urge to take more than the amount prescribed. Id. When he met with Dr. Kirby on August 15, 2018, Plaintiff admitted being addicted to Valium. Id. at 643. On MSE, Dr. Kirby noted a mild tremor, slow speech, and irritated mood. Id. at 645. Dr. Kirby started a Valium taper and referred Plaintiff to an intensive outpatient program. Id. Dr. Kirby noted that Plaintiff had poor insight and blamed Dr. Shamsi for his Valium misuse. Id.

On August 17, 2018, Russell Mazda, D.O., treated Plaintiff for left arm pain at the Phoenixville Hospital Emergency Department. Tr. at 582. The pain resolved and Dr. Russell told Plaintiff to take Tylenol if the pain returned and to follow up with his psychiatrist. Id. at 591. When Plaintiff saw Therapist Gustafson the following day, he reported going to the hospital for the arm pain because he feared a heart attack. Id. at 647. Dr. Kirby noted Plaintiff's complaints of increased anxiety and a tremor when she saw him on August 21, 2018. Id. at 648. On MSE, Plaintiff had an anxious mood and constricted affect. Id. at 649-50. Dr. Kirby continued the Valium taper. Id. at 650. Ten

[20]Escitalopram (brand name Lexapro) is an antidepressant used to treat major depressive disorder and anxiety. See https://www.drugs.com/escitalopram.html (last visited Aug. 24, 2026).

days later, Therapist Gustafson noted that Plaintiff appeared calm and reported less anxiety. Id. at 652.

On September 8, 2018, Plaintiff reported that he was feeling restless and depressed and having a "scared feeling all the time." Tr. at 653. Plaintiff asked to slow the Valium taper. Id. at 655. Dr. Kirby continued the Valium taper and encouraged psychotherapy. Id. at 656. Plaintiff expressed to Therapist Gustafson that he believed his increased anxiety was related to the Valium taper. Id. at 658. On October 4, 2018, when Plaintiff had been without Valium for 16 days, he complained of numbness in his face and neck, anxiety, and dissociative feelings. Id. at 660. The following day, Therapist Gustafson noted that Plaintiff "took a minor event and turned it into a major catastrophe in his mind." Id. at 665. Plaintiff reported difficulty leaving his house. Id.

On November 1, 2018, Plaintiff was "feeling a little better," but complained of tremors in his hands and feeling "spaced out some times" or "like time stands still." Tr. at 668. Dr. Kirby noted that Plaintiff was "[i]mproving," and decreased Lithium to address the tremors. Id. at 670-71. The following day, he discussed his dissociative episodes with Therapist Gustafson and reported that they happen infrequently. Id. at 673.

On November 7, 2018, Plaintiff "appeared with improved mood," and Plaintiff said "[h]e attributes feeling better since starting Depakote and in consistently utilizing the mindfulness grounding exercise." Tr. at 674. On December 4, 2018, Plaintiff told Therapist Gustafson that he had recently seen the doctor for back pain, concerned that he may have cancer, and had difficulty accepting the diagnosis of muscle spasms. Id. at 678. Therapist Gustafson noted that Plaintiff had difficulty changing his catastrophic

thinking about health, but could consider alternative possibilities at the end of the session. Id. Dr. Kirby noted that Plaintiff had a slight decrease in anxiety, but was "still extremely ruminative, somatic, convinced that he has severe illness, easily overwhelmed[,] and in mod[erate] distress most of the time." Id. at 681. The next several sessions with Therapist Gustafson focused on processing negative thoughts and Plaintiff's difficulty interacting with others. Id. at 684 (12/11/18), 686 (12/19/18), 688 (1/2/19).

On January 3, 2020, Dr. Kirby noted that Plaintiff "has no structure" and "must get out of bed and do something." Tr. at 700. She increased Lithium. Id. On February 8, Plaintiff expressed frustration with Dr. Kirby and her failure to help him feel better. Id. at 713. Dr. Kirby added Lexapro and encouraged Plaintiff to change psychiatrists in the office. Id. On February 27, 2029, Therapist Gustafson noted Plaintiff's improved mood and Plaintiff indicated that Lexapro was helping. Id. at 715. On March 12, 2016, Plaintiff shared that he felt guilty for being critical of Dr. Kirby. Id. at 717. Although Plaintiff reported ongoing anxiety, his coping skills were helping him manage. Id.

On March 18, 2019, Plaintiff reported to Dr. Kirby that he was feeling "great compared to the last time I seen you." Tr. at 719. He showed an interest in hobbies and was practicing better self-care. Id. On March 26, 2019, Therapist Gustafson noted that Plaintiff "is making progress with less worry and anxiety." Id. at 732. On May 14, 2019, Plaintiff reported to Dr. Kirby that he felt "more like himself," and had a normal MSE Id. at 737-39. Dr. Kirby found Plaintiff was "[i]mproving," was calmer, and his depression was better managed. Id. at 746. In the subsequent therapy sessions, Plaintiff

discussed his difficulty in social situations. Id. at 752 (6/11/19), 753 (6/25/19), 754 (7/8/19).

On July 17, 2019, Dr. Kirby completed a Medical Source Statement, indicating that Plaintiff had mild limitation in the abilities to understand, remember, and carry out instructions, and make judgments on simple work-related decisions. Tr. at 758. The doctor found Plaintiff had marked limitation in the abilities to interact with the public, supervisors, and coworkers; moderate limitation in the abilities to respond appropriately to usual work situations and maintain concentration, persistence, and/or pace; and mild limitation in the ability to respond to changes in a routine work setting. Id. at 759. Dr. Kirby opined that Plaintiff would be off-task 20% of the work day and that he would miss work one day a week. Id. at 759-60.

2. State Agency Physician

At the initial consideration stage on June 5, 2018, Helen Parshall, Ph.D., found from her review of Plaintiff's records that Plaintiff had mild limitation in the abilities to adapt or manage oneself and concentrate, persist or maintain pace. Tr. at 79. Dr. Parshall found Plaintiff had moderate limitation in the abilities to understand, remember, or apply information, and interact with others. Id. Dr. Parshall further found that Plaintiff's mental impairments were severe, "but do not prevent [Plaintiff] from performing simple daily routines and activities." Id. at 83.

**D. Plaintiff's Claims**

1. Consideration of Treating Psychiatrist's Opinion

Plaintiff complains that the ALJ failed to properly consider Dr. Kirby's opinions that Plaintiff had marked limitations in interaction, would be off task 20% of the time, and would be absent once a week. Doc. 10 at 8. Defendant responds that the ALJ's decision is supported by substantial evidence, specifically Plaintiff's conservative mental health treatment and improvement when he was compliant with medication. Doc. 11 at 7 (citing tr. at 17). In reply, Plaintiff argues that the ALJ ignored relevant evidence and completely failed to address consistency. Doc. 12.

The ALJ's consideration of medical opinion evidence is governed by regulations which focus on the persuasiveness of each medical opinion.

> We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources.

20 C.F.R. §§ 404.1520c(a); 416.920c(a). The regulations list the factors to be utilized in considering medical opinions: supportability, consistency, treatment relationship (including the length and purpose of the treatment and frequency of examinations), specialization, and other factors including familiarity with other evidence in the record or an understanding of the disability program. Id. §§ 404.1520c(c); 416.920c(c). The most important of these factors are supportability and consistency, and the regulations require the ALJ to explain these factors, but do not require discussion of the others. Id. §§ 404.1520c(b)(2); 416.920c(b)(2). The regulations explain that supportability means

"[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . , the more persuasive the medical opinions . . . will be." Id. §§ 404.1520c(c)(1); 416.920c(c)(1). In addition, consistency means "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources . . . , the more persuasive the medical opinion(s) . . . will be." Id. §§ 404.1520c(c)(2); 416.920c(c)(2).

In addressing the opinion evidence, the ALJ found that Dr. Kirby's opinion was partially persuasive.

> [Dr. Kirby's] opinion is only partially persuasive to the extent it is supported by the overall record and consistent with limitations for simple, routine tasks, simple work-related decisions, and restrictions interacting with others. However, there is simply no evidence to support marked limitation in [Plaintiff's] ability to interact with others or need for excessive breaks and/or absences. [Plaintiff's] mental health treatment has been greatly conservative in nature and he appears to respond well to medication when compliant.

Tr. at 17. The ALJ then discussed Dr. Parshall's opinion, in which the doctor found no more than moderate limitation in the areas of mental functioning.

> [Dr. Parshall's] opinion is persuasive to the extent it is supported by the overall medical evidence and consistent with limitations including simple, routine tasks, simple work-related decisions, and restrictions interacting with others.

Id. at 17-18.

a. Supportability

Plaintiff complains that the ALJ's statement that "there was 'simply no evidence to support marked limitation[s]' is belied by the record," citing abnormal findings on MSE and various observations and notations contained in the record. Doc. 10 at 9 (citing tr. at 332, 628, 649, 654, 661-62, 669-70, 680-81, 686, 688, 691-92, 704-05). Defendant responds that the ALJ's opinion is supported by substantial evidence because "Plaintiff's mental health treatment was generally conservative, and his symptoms improved when he was compliant with treatment," and when read as a whole, the ALJ's decision "sufficiently explain[s] his findings to permit meaningful review." Doc. 11 at 6.

Plaintiff mischaracterizes the evidence suggesting that the cited notations support a finding of marked limitation in interaction.[21] For example, notations that Plaintiff had a depressed or anxious mood, a flat or dysthymic affect, and fair judgment and insight do not support marked limitations in interaction. The more significant notations that Plaintiff was showering only once a month, had perceptual disturbances, was extremely ruminative, and in moderate distress occurred when Plaintiff was not compliant with his medication. See id. at 681 (12/6/18 – extremely ruminative, somatic, easily overwhelmed and in moderate distress most of the time), 332 (2/19/18 – "Client reports that he only showers one time per month [and] sometimes hears voices or sees things"). Review of the record reveals that Plaintiff reported to Dr. Shamsi that he had stopped taking lithium

---

[21]Specifically, the Medical Source Statement completed by Dr. Kirby defined a marked limitation as indicating "[t]he indiviual's functioning is **seriously limited** in this area." Tr. at 758.

against the doctor's advice in January 2018, id. at 388, and that he "ran out of Valium [in December 2018] and did not get the prescription filled" and took "left over Klonopin," id. at 389, 532, coinciding with the increase in his symptomatology.[22]

Plaintiff also argues that Dr. Kirby reported "that [Plaintiff] had 'social anxiety' and 'stress reactions to environment' which supported her assessment. Doc. 10 at 9 (citing tr. at 759). Such notations do not support marked limitations. See Walker v. Barnhart, 172 F. App'x 423, 246 (3d Cir. 2006) ("Mere presence of a disease or impairment is not enough. A claimant must show that his disease or impairment caused functional limitations that precluded him from engaging in any substantial gainful activity.")

Plaintiff argues that "[t]he ALJ's complete failure to mention or consider Dr. Kirby's supporting explanations makes his supportability analysis fundamentally deficient." Doc. 10 at 9-10. Defendant responds that, when the ALJ's decision is read as a whole, the ALJ's reasoning provides for meaningful review. Doc. 11 at 6.

In analyzing an ALJ's decision, this court must not consider the ALJ's findings in isolation, rather, the Third Circuit has instructed that an ALJ's decision is to be read "as a

---

[22] Plaintiff argues that the ALJ made no finding of a failure to follow prescribed treatment and no such finding was warranted. Doc. 10 at 11 n.6. Contrary to Plaintiff's assertion, although the ALJ did not cite to the regulations governing the failure to follow prescribed treatment, she found that his symptoms were exacerbated when he was not compliant with his medications and the record, including Dr. Shamsi's treatment notes that Plaintiff has a "tendency to adjust his own medication," and his increased symptomatology when not compliant support the ALJ's decision in this regard. See tr. at 16.

whole." Fullen v. Comm'r of Soc. Sec., 704 F. App'x 121, 124 (3d Cir. 2017) (citing Jones v. Barnhart, 364 F. 3d 501, 505 (3d Cir. 2004)). Here, in reading the decision as a whole, the court finds the ALJ's analysis of the evidence, including Plaintiff's treatment at Creative Health, was sufficient to provide for meaningful review. Although the ALJ did not go through each of Plaintiff's mental health visits at Creative Health, she provided a summary of Plaintiff's treatment and response to treatment. The ALJ first discussed Plaintiff's psychiatric history, the exacerbation of his symptoms when he did not follow his medication regimen, and discussed his improvement on Depakote and Lexapro. Tr. at 16. In addition, in addressing the mental health Listings, the ALJ found that the evidence supported moderate limitation in Plaintiff's ability to interact with others, citing "treatment records describ[ing Plaintiff] as cooperative and engaged in sessions, but with occasionally high levels of agitation and anxiety (particularly when non-compliant with medication) and a tendency to frequently call the office for trial matters between visits." Id. at 13 (citing tr. at 444-550, 597-755). I find no error in the ALJ's analysis.

b. Consistency

Plaintiff claims "[t]he ALJ completely failed to consider or explain the consistency factor in her decision." Doc. 10 at 11. Again, when read as a whole, the ALJ provided ample analysis to provide for meaningful review. The ALJ reviewed Plaintiff's treatment history, noting the exacerbations of his symptoms when he was not compliant with his medication regimen when treated by Dr. Shamsi and Dr. Kirby. Tr. at 16. Moreover, the ALJ addressed Dr. Parshall's RFC assessment, finding no more than

moderate limitations, immediately following her discussion of Dr. Kirby's Medical Source Statement. Id. at 17. I find no error in the ALJ's weaving discussion of Plaintiff's mental health treatment throughout the opinion.

c. Conservative Treatment

Plaintiff also argues that the ALJ erred in characterizing his treatment as conservative and discounting Dr. Kirby's opinion on that basis. Doc. 10 at 12, In support of this argument, Plaintiff relies on Sykes v. Apfel, 228 F.3d 259, 266 n.9 (3d Cir. 2000). However, a careful reading of Sykes reveals that the Third Circuit found that the ALJ erred when "[t]he only explanation offered" to reject the plaintiff's testimony regarding the intensity of his pain was the plaintiff's conservative treatment. Id.

Some courts in our circuit have found that the determination of whether treatment is conservative is a medical opinion, and absent such medical statement, the ALJ has erred. See Mandy B. v. Bisignano, Civ. No. 24-1382, 2026 WL 2280639, at *11 (M.D. Pa., Aug. 7, 2026) ("We are unable to find support in the record for the ALJ's finding that this treatment was conservative in the form of an opinion by a medical professional; rather, it appears to be based upon the ALJ's lay judgment."). Other courts allow an ALJ to make a characterization of conservative treatment without a direct medical opinion and have affirmed the Commissioner's decision if the ALJ's characterization is supported by the evidence and remanded where the characterization is not supported by the record. See S.J. v. Bisignano, Civ. No. 23-2886, 2025 WL 2599529, at *7-8 (E.D. Pa. Sept. 8, 2025) (finding no error in the characterization of mental health treatment as "generally conservative, routine mental health treatment" despite the claimant's use of antipsychotic

medication, one psychiatric hospitalization, and weekly therapy, where the ALJ compared the treating physician's opinion with the other opinion evidence and the "mostly mild to moderate results observed in [MSEs] within the record"); see also Hull v. Berryhill, Civ. No. 18-006, 2018 WL 3546555, at *10 (M.D. Pa. July 24, 2018) ("Because the Court does not find a basis to deem [the plaintiff's] level of treatment conservative, the ALJ's labeling it so cannot be considered supportive of his determination that the opinions were entitled to limited weight."); Thomas v. Colvin, Civ. No. 15-876, 2016 WL 4537065, at *3 (W.D. Pa. Aug. 30, 2016) (ALJ erred when he described the plaintiff's treatment as limited and conservative when Depakote and Xanax were prescribed and the plaintiff consistently treated with mental health professionals and counseling sessions); Flim v. O'Malley, Civ. No. 22-1619, 2024 WL 3361646, at *17 (M.D. Pa. July 10, 2024) ("courts have found that therapy and medication management, to which a claimant responds well, are properly categorized as conservative treatment") (citing Snodgrass v. Comm'r of Soc. Sec., Civ. No. 20-2093, 2022 WL 853628, at *8 (M.D. Pa., Mar. 22, 2022)).

Plaintiff's argument misses the mark. The ALJ found that Dr. Kirby's opinion was partially persuasive, "to the extent it is supported by the overall record and consistent with limitations for simple, routine tasks, simple work-related decisions, and restrictions interacting with others. However, there is simply no evidence to support marked limitations in [Plaintiff's] ability to interact with others or need for excessive breaks and/or absences. [Plaintiff's] mental health treatment has been greatly conservative in nature and he appears to respond well to medication when compliant." Tr. at 17.

As previously discussed, the ALJ's conclusion is consistent with the record evidence. When Plaintiff was compliant with his medication regimen, his mental status was relatively stable. See, e.g., id. at 625 (7/7/18 – Therapist Gustafson noted Plaintiff appeared happy, able to reflect and analyze his thoughts, less anxious and depressed on Depakote), 674 (11/7/18 – Therapist Gustafson noted improvement when Plaintiff compliant with Depakote and utilizing mindfulness grounding exercise), 715 (2/27/19 – Therapist Gustafson noted Plaintiff's improved mood on Lexapro). Plaintiff suffered mental symptom exacerbations when he was not compliant with his medication. See, e.g., id. at 389 (1/29/18 – failure to get Valium prescription filled explained severe level of anxiety and agitation), 332, 388 (2/19/18 – "Client reports that he only showers one time per month [and] sometimes hears voices or sees things" when Plaintiff reported to Dr. Shamsi three weeks earlier that he had stopped taking lithium against the doctor's advice in January 2018).

Moreover, Dr. Kirby's findings of marked interaction limitations and excessive absences are inconsistent with Dr. Parshall's findings of no more than moderate social interaction limitations and the ability to perform simple daily routines and activities. See tr. at 83. In short, the ALJ reviewed the evidence and correctly observed that "when compliant with medication, the record reflects relative stability in [Plaintiff's] mood with decreased anxiety and agitation." Tr. at 17. The ALJ reviewed the opinion evidence and found that Dr. Parshall's assessment was supported by the overall medical evidence, and Dr. Kirby's findings of marked limitation in interaction and need for excessive absences

and breaks were inconsistent with the treatment records and Dr. Parshall's opinion. Those findings are supported by substantial evidence in the record.

2. RFC and Hypothetical

Finally, Plaintiff argues that the ALJ failed to include all of Plaintiff's credibly established limitations in the RFC assessment and the hypothetical posed to the VE. Doc. 10 at 13-14. Defendant responds that the ALJ properly considered the evidence and included the credibly established limitations in the RFC assessment and in questioning the VE. Doc. 11 at 8-9.

In order for a VE's testimony to constitute substantial evidence, the hypothetical question posed must consider all of the claimant's impairments which are supported by the record. Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987) (citing, inter alia, Podedworny v. Harris, 745 F.2d 210 (3d Cir. 1984)). Plaintiff's argument is based upon the limitations included in Dr. Kirby's assessment, which the ALJ found were inconsistent with the treatment record and with Dr. Parshall's assessment, previously discussed. As discussed in the prior section, the ALJ's consideration of the opinion evidence is supported by substantial evidence and her failure to include these limitations in the RFC assessment and the hypothetical posed to the VE is not error.

## IV. CONCLUSION

The ALJ's decision is supported by substantial evidence. When the ALJ's opinion is read as a whole, it is clear that the ALJ properly considered the supportability of Dr. Kirby's opinion and consistency of that opinion with the record and Dr. Parshall's

assessment. The failure to include Dr. Kirby's additional limitations (marked interaction limitations, and excessive absences and breaks) in the RFC assessment was not error.

An appropriate Order follows.